(Doc. Nos. 110, 119, 120)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| DONALD GARDNER, | : | |
| | : | |
| Plaintiff, | : | Civil No. 15-08982 (RBK/AMD) |
| v. | : | |
| | : | **OPINION** |
| NEW JERSEY STATE POLICE, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**KUGLER**, United States District Judge:

This matter is before the Court on three summary judgment motions filed by police officers involved at various points in the pursuit of a fleeing motorist, Donald Gardner ("Plaintiff"). The pursuit ended with the police officers shooting Gardner, who sustained severe paralysis. Gardner then sued the various officers involved in the pursuit. As it stands, excessive force and related state law claims remain against: (1) Michael Bordonaro and Steven Swankoski (the "EHT Defendants"); (2) Jeremy Nirenberg; and (3) New Jersey State Police, Edwin Huber, Andrew Koch, Paul Horsey, and Jack Donegan (the "State Defendants"). The motions largely turn on one question: did the officers act reasonably? Because material facts in dispute bear on that question as to the EHT Defendants, their motion is **DENIED IN PART**. The motions of Nirenberg and the State Defendants are **GRANTED**, and the state law claims against them are **DISMISSED** for lack of subject matter jurisdiction.

# I.    BACKGROUND[1]

## A.  The Parties and Pre-Incident

On November 7, 2013, Plaintiff Donald Gardner was shot by now retired police officers Michael Bordonaro, Steven Swankoski, and Jeremy Nirenberg in a marsh in Egg Harbor Township.  (Doc. No. 115 ("Compl.") at ¶¶ 29–31.)  Bordonaro was a lieutenant in the Egg Harbor Township Police Department.  (EHT Defs.' SMF at ¶¶ 22–23.)  Swankoski was a Patrol Sergeant with the Egg Harbor Township Police Department.  (*Id.* at ¶ 90.)  Nirenberg was a Detective with the Atlantic City Police Department.  (*Id.* at ¶ 127.)  The other defendants are Detective Sergeant First Class Edwin Huber, Trooper Andrew Koch, Trooper Paul Horsey, and Trooper Jack Donegan, all of whom interacted with Gardner in his vehicle before the shooting. (State Defs.' SMF at ¶¶ 1, 10–16.)  These defendants were assigned to the New Jersey State Police's Casino Gaming Bureau in Atlantic City.  (*Id.* at ¶ 1.)

Gardner previously served 19 years in prison for manslaughter.  (EHT Defs.' SMF at ¶ 12; Gardner Dep. at 26:15–21.)  After his release but before the marsh events, the New Jersey State Police Atlantic City Task force executed a search warrant at Gardner's property, resulting in various charges and the recovery of drugs, a sawed-off shotgun, and a 9-millimeter Luger Tec-9.  (EHT Defs.' SMF at ¶¶ 10–11.)  Defendant Nirenberg, who helped execute this search, was present for these recoveries.  (Nirenberg SMF at ¶¶ 1–3.)  Also before the marsh events, the Egg Harbor Township Police Department generated several intelligence reports about Gardner, including one stating that Gardner was suspected of distributing drugs for a gang, had a "violent

---

[1] In addition to the relevant record evidence, the facts are drawn from the parties' Statements of Material Facts ("SMF") where the parties admit the facts asserted or admit that the SMF's assertion accurately reflects the relevant testimony.  Disputed facts are noted accordingly.  At summary judgment, the Court views the facts in light most favorable to Gardner, the nonmovant.

history," and that officers should use "extreme caution" with Gardner.  (EHT Defs.' SMF at ¶¶ 13–14.)

In a similar "be on the lookout" bulletin ("BOLO") issued about a week before the incident, the Egg Harbor Township Police Department warned that Gardner would soon be sentenced in a pending state court case and that Gardner, out on bail, stated that he intended to "shoot someone before his upcoming sentencing date and would shoot police too."  (*Id.* at ¶¶ 15–16.)  The BOLO also stated that earlier in the month, a homicide occurred in a hotel room rented by Gardner, who was not charged, but may have information about it.  (*Id.*)  The BOLO contained a picture of Gardner's distinctive Jaguar and advised police officers to use "extreme caution" with him.  (*Id.*)  An accompanying bulletin contained information from a confidential informant, who stated that Gardner "is extremely violent and had vowed to never go back to prison," had "stated multiple times that he will kill police to ensure his freedom or they will have to kill him," and that he helped beat another individual.  (*Id.* at ¶¶ 17–18.)

### B.  Initial Contact By The State Defendants

On November 7, 2013, defendants Huber, Koch, Horsey, and Donegan were driving outside Atlantic City when they noticed Gardner's distinctive Jaguar.  (State Defs.' SMF at ¶¶ 9–10.)  Horsey testified that they were all familiar with the BOLO.  (*Id.* at ¶ 11.)  The troopers began following Gardner.  (*Id.* at ¶ 16.)  Defendant Huber testified that the BOLO was informational and not a call to arrest Gardner or take other action.  (Pl.'s Resp. to State Defs.' SMF at ¶ 48.)  Gardner turned down a dead-end street.  (State Defs.' SMF at ¶ 17.)  After stopping in a driveway, he began backing up.  (*Id.* at ¶ 19.)  The accounts diverge from here.

According to the State Defendants, they activated their vehicle's lights once the Jaguar reversed.  (*Id.* at ¶ 20.)  Koch, Horsey, and Donegan then exited their vehicle, approached the

car, tapped on the window and identified themselves as police. (*Id.* at ¶¶ 23–24.) Donegan testified that Gardner then "immediately" put the car in drive and moved forward to turn the car around. (*Id.* at ¶ 26.) Horsey testified that Gardner then turned the vehicle around towards the officers and drove at Horsey and Donegan. (*Id.* at ¶¶ 27–28.) Both officers claim they were forced to evade Gardner's Jaguar. (*Id.* at ¶ 28.) Gardner, by contrast, claims that when he turned down the dead-end street and sought to turn around, he saw "four people standing there with guns [pointed at him] in the middle of the street." (Pl's. Resp. to State Defs.' SMF at ¶¶ 45–47.) As Gardner tells it, there was no siren, no cop cars, no police uniforms, and when he saw people with guns, he "turned around to pull back around and took off." (Gardner Dep. at 45:15–21.) He also stated that he heard yelling as he drove by the officers but could not hear the words because his radio was blasting. (*Id.* at 49:6–21.) In his estimation, his vehicle was not close to contacting anyone. (*Id.* at 50:22–24.)

Thereafter, Donegan, Horsey, and Koch got back in their car and Huber called 9-1-1. (State Defs.' SMF at ¶ 31.) During the call, Huber told dispatch that Gardner possessed a gun. (*Id.* at ¶ 33.) Huber testified that he made that statement—twice—based on the BOLO. (Huber Dep. at 37:20–38:10.) Gardner and the State Defendants dispute much of the following events, particularly the effect of Huber telling dispatch that Gardner had a gun and whether any of the other State Defendants definitively knew or stated that Gardner did or did not have a gun. They agree, however, that nobody called back to dispatch to clarify whether Gardner had a gun. (Pl.'s Resp. to State Defs.' SMF at ¶ 51.) Gardner stated that after he sought to escape from what turned out to be the State Defendants, he drove off, parked his car, and ran into an area with shallow water and high grass. (*Id.* at ¶ 54.) A manhunt ensued.

## C. The Shooting

As Gardner drove off, Bordonaro heard a dispatch call about Gardner. (EHT Defs.' SMF at ¶¶ 28–30, 38.) Bordonaro testified that dispatch stated that Gardner had attempted to assault a state police officer with his car and fled. (*Id.* at ¶¶ 30, 37.) As a result, Bordonaro stated that he felt Gardner posed a threat to officers and civilians; Bordonaro also stated that he had learned of the BOLO by this time. (*Id.* at ¶¶ 30, 34.) However, Bordonaro stated that he could not recall if dispatch stated that Gardner was armed. (*Id.* at ¶ 31.) After hearing the call, Bordonaro left his desk, got in his vehicle, and drove towards Gardner's potential location. (*Id.* at ¶ 38.) Around the same time, Swankoski stated that he received a radio transmission that Gardner almost ran over one of the State Defendants. (*Id.* at ¶ 96.) Swankoski, then at the station, also proceeded to his vehicle. (*Id.* at ¶ 98.) Swankoski stated that before the shooting, he recalled hearing briefings about Gardner and knew of the BOLO. (*Id.* at ¶¶ 94–95.)

For his part, Nirenberg had surveilled Gardner for drug activities the morning of the incident. (Nirenberg SMF at ¶ 12.) When he returned to the Atlantic City police station later that morning, he heard over dispatch that Gardner had fled from the State Police and attempted to run over an officer. (*Id.* at ¶ 14.) He stated that dispatch repeated the BOLO warning, including that Gardner was possibly armed, dangerous, and would shoot police. (*Id.* at ¶ 15.) Nirenberg was also aware that Gardner was paranoid about law enforcement, had previously possessed weapons, including the shotgun and Tec-9 recovered at his home, had served a prison sentence for shooting someone, and that the BOLO warned officers to treat Gardner with "extreme caution." (*Id.* at ¶¶ 3–4, 9, 11.) After dispatch relayed a report that someone had been seen fleeing into the marsh near where Gardner's vehicle had also been recovered, Nirenberg

stated that he went to the scene because there was a call for police help and because he had been a part of Gardner investigations. (*Id.* at ¶¶ 16–19.)

Eventually, multiple officers from multiple police departments—including Bordonaro, Swankoski, and Nirenberg—converged on the marsh area where Gardner's car was found. (EHT Defs.' SMF at ¶ 40.) Bordonaro took charge. (*Id.* at ¶ 41.) He stated that there were no homes, pedestrians, or vehicles nearby. (Bordonaro Dep. at 92:22–93:6.) An Atlantic City SWAT team tactically cleared Gardner's car and determined it was empty. (EHT Defs.' SMF at ¶¶ 43–46.) Then, another officer, Gary Johnson—positioned on the roof of a nearby building—spotted unusual movement in the marsh water. (*Id.* at ¶¶ 48–50.) Although a K-9 unit was already heading towards the marsh, that unit was unreachable on Bordonaro's radio. (*Id.* at ¶¶ 49, 51.) Bordonaro stated that because he was the only other K-9 unit on scene, he and a team headed towards the marsh. (*Id.* at ¶ 52.) Bordonaro stated that he intended for Officer Johnson to guide the team towards the unusual movement. (*Id.* at ¶¶ 52, 59.) Nirenberg and Swankoski were among the officers following Bordonaro towards the marsh. (*Id.* at ¶ 56; Nirenberg SMF at ¶ 21.)

According to Bordonaro, his plan was to head to a beach area at the water's edge and coordinate with Johnson. (EHT Defs.' SMF at ¶¶ 59–60.) Approaching the beach, Bordonaro took the lead with his K-9 on a ten-foot lead and with the other officers trailing behind him. (*Id.* at ¶ 61.) Bordonaro proceeded over a hill, at which point he stated he identified Gardner in the water about twenty to twenty-five yards away. (*Id.* at ¶ 63.) Swankoski, on Bordonaro's left side, also saw Gardner in the water and un-holstered his weapon. (*Id.* at ¶¶ 104–106.) As Bordonaro and Swankoski went over the hill, Nirenberg, still behind them, stated that he heard them yell, "let me see your hands" and similar commands. (Nirenberg SMF at ¶ 23.) He also

stated that he heard Bordonaro give K-9 commands. (*Id.* at ¶ 24.) When Nirenberg got to the top of the hill, he saw Gardner in the water. (*Id.* at ¶ 25.) From here, the parties accounts diverge again.

### 1. Accounts of Bordonaro, Swankoski, and Nirenberg

Bordonaro stated that when Gardner came into view, he observed Gardner with only his head above the water and with a black hood over his head. (EHT Defs.' SMF at ¶ 64.) Swankoski described Gardner as on his stomach in the water with his head and part of his back showing. (*Id.* at ¶ 113.) Nirenberg similarly described Gardner as laying down in the water, submerged, with only his head and neck showing. (Nirenberg SMF at ¶¶ 27–28.) According to Nirenberg, he could not see through the dirty bay water. (EHT Defs.' SMF at ¶ 137.) The officers stated that they could not see Gardner's submerged hands. (EHT Defs.' SMF at ¶¶ 68, 109; Nirenberg SMF at ¶¶ 31.) Bordonaro stated that he and the officers behind him commanded Gardner to show his hands. (EHT Defs.' SMF at ¶¶ 65, 70.)

The officers moved to various positions. Bordonaro began to close in on Gardner, moving within thirty feet. (*Id.* at ¶¶ 67, 69.) After Gardner kept refusing to show his hands, Bordonaro stated that he sent his K-9 forward and un-holstered his weapon. (*Id.* at ¶¶ 71–72.) At this point, Swankoski stated that he moved up to Bordonaro's right side and pointed his gun at Gardner. (*Id.* at ¶¶ 73–74.) Bordonaro moved into the water closing in on Gardner. (*Id.* at ¶ 75.) Swankoski, by contrast, stated that he moved directly in front of Gardner, but remained on the beach to Bordonaro's right. (*Id.* at ¶ 75.) The beach is elevated above the water. (Bordonaro Dep. at 110:6–9.) Nirenberg stated that he remained about five to ten feet behind Bordonaro and Swankoski the whole time and never left the hill. (Nirenberg Dep. 51:12–16; *id.* at 60:10–24.) Nirenberg was in the middle between Bordonaro and Swankoski, with Bordonaro in front of

Nirenberg to Nirenberg's left, and Swankoski in front of Nirenberg to Nirenberg's right. (*Id.* at 61:7–25.)

Bordonaro stated that he did not know if Gardner was armed at this point but assumed so given his criminal history. (EHT Defs.' SMF at ¶ 77.) As the officers gave their commands, Bordonaro stated that Gardner's hands remained submerged. (*Id.* at ¶ 80.) Then, he stated that he observed Gardner pull what looked like a black barrel out of the water pointing directly at Swankoski. (*Id.* at ¶ 82.) Swankoski, Nirenberg, and another officer in the area stated that they observed the same. (*Id.* at ¶¶ 110, 147–149; Nirenberg SMF at ¶¶ 30–31.) Bordonaro, Swankoski, Nirenberg, and the other officer testified that they believed the black object rising from the water was a gun barrel. (Nirenberg SMF at ¶¶ 30–31; EHT Defs.' SMF at ¶¶ 81, 110, 139, 143, 147.) Shots fired.

At the time Gardner allegedly pointed the barrel at Swankoski, Gardner's precise position and movements in the water in relation to the officers are not entirely clear. Bordonaro's testimony suggests that Gardner was initially facing him while in the water (Bordonaro Dep. at 94:2–6), and that Gardner began to turn his back to Bordonaro, thereby turning towards Swankoski's beach position on Bordonaro's right. (*Id.* at 94:3–9; *id.* at 96:5–21.) According to Bordonaro, this turn pointed Gardner's right shoulder towards him. (*Id.* at 103:20–104:5.) Thus, Bordonaro's K-9 approached Gardner's right side. (EHT Defs.' SMF at ¶ 78.) The turn seemingly positioned Swankoski directly in front of Gardner on the beach. (Bordonaro Dep. at 105:1–7.) Nirenberg also suggested that Gardner appeared to be turning towards Swankoski. (Nirenberg SMF at ¶ 32.)[2] The report by Highlands Forensics suggests similar positioning. (*See*

---

[2] Swankoski's testimony as to the turn is unclear. (EHT Defs.' SMF at 110; *see also* Swankoski Dep. at 76:14–78:4.) He describes it as Gardner rolling his body slightly to the left while submerged horizontally in the water, potentially towards Swankoski. (*Id.*)

Highlands Forensic Incident Review at App. H.)  Bordonaro estimated that Swankoski was approximately eight feet away from Gardner on the beach abutting the water.  (Bordonaro Dep. at 106:14–25.)  Bordonaro stated that when he observed the black object rise from the water, it was pointed straight at Swankoski.  (*Id.* at 110:3–9.)

Beleiving that the barrel was a gun and posing a threat to Swankoski, Bordonaro stated that he fired his weapon.  (EHT Defs.' SMF at ¶¶ 83–85.)  Swankoski also stated that he fired once he saw the object emerge from the water.  (*Id.* at ¶ 115.)  Bordonaro stated that he could not recall whether he or Swankoski shot first.  (*Id.* at ¶ 84.)  Nor could Swankoski recall if he shot first.  (Swankoski Dep. at 83:2–5.)  Bordonaro stated that Gardner was facing Swankoski on the beach when the officers fired their weapons.  (EHT Defs.' SMF at ¶ 86.)  Bordonaro explained that he fired his weapon as Gardner turned away from him because he felt Gardner was armed, posed an immediate threat to Swankoski, and the threat was not neutralized.  (*Id.* at ¶ 89.)  According to Swankoski, he stopped firing when he saw the barrel go back into the water, but fired again when it reappeared above the water.  (*Id.* at ¶¶ 116–117.)  He stated that once it went back into the water, he stopped firing.  (*Id.* at ¶ 118.)  Swankoski stated that he did not hear any other gunfire once the barrel went back into the water.  (*Id.* at ¶ 123.)

From Nirenberg's view on the hill about ten to fifteen yards from Gardner (Nirenberg Dep. at 60:7–61:25), Gardner appeared to be turning toward Swankoski when he heard a shot.  (Nirenberg SMF at ¶ 32.)  At that point, Nirenberg stated that he believed Gardner shot at Swankoski, so he returned fire, fearing for his and the others' lives.  (*Id.* at ¶¶ 33–34.)  Nirenberg discharged seven bullets.  (*Id.* at ¶ 35.)  In all, sixteen shell cases were recovered from the scene.  (*See* Highlands Forensic Incident Review at 3.)  Five bullets hit Gardner, including one in his

buttock, two in his back, one in his right forearm, and one in his right mid-thigh. (*Id.* at 4.) Officer Bordonaro's K-9 was shot in the neck. (Nirenberg Dep. at 59:6–12.)

### 2. Gardner's Account

Gardner's story differs. Gardner stated that after he drove away from the State Defendants, he parked his car and headed into the marsh about fifty yards away. (Gardner Dep. at 46:2–20.) He stated that he squatted down in the area for about half an hour to an hour. (*Id.* at 46:12–16.) Gardner testified that in doing so, the water went up to his chin. (*Id.* at 53:3–8.) Gardner stated that after about thirty minutes, he decided to walk back to his car, so he began exiting the water to head towards the embankment. (*Id.* at 55:21–56:2.) Gardner stated that he never made it out of the water because, when he was about ten or fifteen feet from the bank, he observed officers emerging, guns drawn. (*Id.* at 56:5–9.) Gardner testified that he heard the oncoming officers scream at him to exit the water and to put his hands up. (*Id.* at 57:1–11.)

Rather than comply, Gardner stated that he decided to "turn[] around and start[] head[ing] back out into the water," admittedly to "get away." (*Id.* at 57:13–18; *id.* at 72:20–24.) Significantly, although he did not comply with the commands to put up his hands, Gardner testified that when he turned around, his hands were not submerged in the about waist-high water and could be seen. (*Id.* at 130:13–131:2.) As he puts it, he "just turned around" to go in the opposite direction in the water, which was muddy. (*Id.* at 67:8–69:7.) At this point, he stated, the officers started shooting. (*Id.* at 57:13–18.) Gardner stated that he did not know how many officers had shot because his "back was to them." (*Id.* at 58:19–22.) When asked if the officers shot when Gardner was walking away from the officers with his back turned, Gardner testified, "right." (*Id.* at 130:23–131:2.) He also stated that after he was hit and floating on his back paralyzed, the officers were still shooting and a bullet wounded his head. (*Id.* at 58:15–18.)

Gardner stated that he did not recall the amount of time between shots. (*Id.* at 76:13–77:1.) Hector Rios-Ortiz, who was staying at a nearby motel, testified that he heard a single shot, then three or four seconds later, about fifteen shots. (Pl.'s Resp. to EHT Defs.' SMF at ¶¶ 219–224.) According to Rios-Ortiz, he observed a man pacing on the beach just before he heard one shot, though he stated that he did not see a police dog or officers near the man at that time. (Rios-Ortiz Dep. at 49:9–52:4.) Rios-Ortiz testified that the first shot knocked the person into the water causing a splash. (*Id.* at 51:5–10.) Rios-Ortiz is in his 60's, wears reading glasses, has not visited an eye doctor in over twenty-five years, and was apparently around 700 feet away by the motel when he observed the events. (EHT Defs.' Rep. SMF at ¶ 222.)

A maintenance worker in a nearby building, George Andrews, also described the scene. Andrews stated that he escorted an officer to the building's roof and saw a person in the marsh. (Pl.'s Resp. to EHT Defs.' SMF at ¶¶ 228–231.) Andrews testified that he saw the person in the water pull himself up on to a round patch in the marsh. (Andrews Dep. at 19:18–20:7.) He stated that as the officers converged, the person "jumped back in the water and then I heard a pop, then maybe a half a second to a second later, a whole bunch of them." (*Id.* at 21:7–15.)

Critically, Gardner denies ever holding any black object. (Gardner Dep. at 74:18–75:2.) When asked if he could see anything in the person's hands before the person "jumped" off the patch into the water, Andrews stated "I couldn't tell, it was very quick." (Andrews Dep. at 21:19–23.) Andrews also stated that before the person pulled up onto the patch, he observed the person "grabbing" pilings in the marsh and "dragging himself" by them in the water. (*Id.* at 18:15–19:11.) Rios-Ortiz testified that from his vantage point, he could see Gardner's hands, which "didn't have anything" in them. (Rios-Ortiz Dep. at 49:22–50:4.) He also stated from "what I saw, he didn't have a gun." (*Id.* at 97:7–16.) At yet another point, Rios-Ortiz was asked

if he could see Gardner's hands and he replied that if Gardner had a gun, he would have seen it reflecting in the sun. (*Id.* at 93:15–23.) Rios-Ortiz also suggested that "if he had a gun, he should have throw[n] it." (*Id.* at 94:7–14.)

### D. Aftermath and Procedural History

After the shooting, Swankoski stated that he saw the black object floating away from Gardner. (EHT Defs.' SMF at ¶ 124.) Swankoski stated that he retrieved the item, which looked like it was two to three feet long. (*Id.* at ¶¶ 125–126.) Defendants retained Highlands Forensics to conduct a shooting incident analysis, which found that the item recovered was a black metal pipe measuring about 30-1/2 inches long. (*Id.* at ¶¶ 208, 210.) One end of the pipe had a molded grip, and the other end transitioned from hexagonal to tubular. (*Id.* at ¶ 210.) The pipe contained defects consistent with bullets and bullet ricochets. (*Id.*)

Gardner suffered full T7 paralysis. (Pl.'s Resp. to EHT Defs.' SMF at ¶ 241.) His paralysis will never improve, and he can feel nothing below his chest. (*Id.* at ¶¶ 241–242.) On November 2, 2015, Gardner sued the New Jersey State Police, Huber, Koch, Horsey, Donegan, Egg Harbor Township, Bordonaro, Swankoski, the City of Atlantic City and Nirenberg in New Jersey state court. The State Defendants timely removed the action to this Court under 28 U.S.C. § 1441(c) and § 1443. (Doc. No. 1.) The operative Complaint (Doc. No. 115) had seven counts:

- Excessive force—against Bordonaro, Swankoski and Nirenberg (Count I);
- Intentional Infliction of Emotional Distress ("IIED")—against all Defendants (Count II);
- Abuse of Process—against all Defendants (Count III);
- Negligence—against all Defendants (Count IV);
- New Jersey Civil Rights Act ("NJCRA") violations—against all Defendants (Count V);
- Claim under 42 U.S.C. Section 1983—against all Defendants (Count VI);
- Punitive Damages—against all Defendants (Count VII)

After motions to dismiss, the Court dismissed Counts I and III as to the EHT Defendants, and Counts II, IV, V, VI, and VII as to Egg Harbor Township. (Doc. Nos. 48, 49.) It also dismissed Counts I, II, IV, V, and VII against Atlantic City. (Doc. No. 73.) The Court then dismissed all claims against Atlantic City, all remaining claims against Egg Harbor Township, and Count III against the EHT Defendants for failure to prosecute. (Doc. No. 101.) Now before the Court are motions by the remaining EHT Defendants (Doc. No. 110), Nirenberg (Doc. No. 119), and the State Defendants (Doc. No. 120), for summary judgment on the remaining claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of showing the absence of a "genuine issue of material fact." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995). "When opposing summary judgment,

the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 Fed. App'x. 353, 354 (3d Cir. 2007) (citation omitted). The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the nonmoving party," *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998), and credibility determinations are for the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

### A. § 1983 (Count VI)

In Count VI, Gardner claims various violations of his Fourth Amendment rights under 42 U.S.C. § 1983, which "imposes civil liability upon any *person* who, acting under the color of state law, deprives another individual of any rights, privileges or immunities secured by the Constitution or laws of the United States." *Doe v. Delie*, 257 F.3d 309, 314 (3d Cir. 2001) (emphasis added). Gardner appears to bring this claim against Defendants in their official and individual capacities. (Compl. at ¶ 36.) The State Defendants are the only ones—including Gardner—who distinguish between these claims. (State Defs.' Br. at 7–10.) Summary judgment is granted on Count IV as to the State Defendants in their *official* capacities because, as they argue and as Gardner does not dispute, they are not "persons" under Section 1983. *See Vance v. New Jersey Div. of Law & Pub. Safety*, No. 12-cv-4006, 2017 WL 3895553, at *3 (D.N.J. Sept. 5, 2017) ("As a matter of law . . . the State Police, and Trooper Kerrick, in his official capacity only, are not 'persons' who may be liable under section 1983."). This also applies to the official capacity claims against the EHT Defendants and Nirenberg, to the extent they are at issue.

That leaves Count VI's individual capacity claims. Defendants seek summary judgment because they did not violate Gardner's Fourth Amendment rights. They also claim qualified immunity. Because "the question of whether a plaintiff has adequately alleged a constitutional violation [under Section 1983] is subsumed within the immunity analysis," the following discussion of immunity accounts both for whether Gardner has stated a Fourth Amendment claim under Section 1983 against each defendant and whether immunity applies. *See Surti v. Craig*, No. 15-cv-3949, 2018 WL 916363, at *4 (D.N.J. Feb. 16, 2018) (quoting *R.K. v. Y.A.L.E. Sch., Inc.*, 621 F. Supp. 2d 188, 196 (D.N.J. 2008)). Only Gardner's claim against the EHT Defendants survives summary judgment.

### 1. Qualified Immunity Overview

The doctrine of qualified immunity shields government officers from civil liability under Section 1983 "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The analysis has two steps. *See Pollock v. The City of Phila.*, 403 Fed. App'x 664, 669 (3d Cir. 2010) (citing *Pearson*, 555 U.S. at 232). The Court must "decide whether the facts . . . make out a violation of a constitutional right." *Id.* (quoting *Pearson*, 555 U.S. at 232). The Court must also "decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* (quoting *Pearson*, 555 U.S. at 232) (internal quotation marks omitted). Courts may assess either step first. *Giles v. Kearney*, 571 F.3d 318, 325 (3d Cir. 2009) (citing *Pearson*, 555 U.S. at 232). If the answer to either question is "no," the analysis may end there. *Pitman v. Ottehberg*, No. 10-cv-2538, 2015 WL 6445872, at *6 (D.N.J. Oct. 23, 2015) (citations omitted).

At summary judgment, qualified immunity is a question of law but is precluded by genuine disputes of material fact. *Giles*, 571 F.3d at 327 (reversing qualified immunity decision that "rest[ed] on a factual presumption that is inappropriate on summary judgment."); *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."). As explained below, the Court denies summary judgment to the EHT Defendants on this claim because genuine disputes of material fact exist as to whether they violated Gardner's Fourth Amendment rights; those disputes also preclude immunity. But the Court grants summary judgment to Nirenberg and the State Defendants because no reasonable jury could find that they violated the Fourth Amendment.[3]

### 2. Section 1983—Excessive Force Against EHT Defendants

Gardner claims that the EHT Defendants violated his Fourth Amendment rights by using excessive force when they shot him in the marsh. For excessive force claims, "a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Davis v. Camden Cty. Bd. of Soc. Servs.*, No. 12-cv-2481, 2014 WL 5292976, at *4 (D.N.J. Oct. 15, 2014). The EHT Defendants do not dispute that their use of force "seized" Gardner. (EHT Defs.' Br. at 4–5.) Thus, the Court

---

[3] The Court reaches these conclusions without regard to Gardner's expert, retired New Jersey State Trooper Sergeant First Class McComb, who Gardner uses to suggest, among other things, alternative actions Defendants could have taken in this case. (Pl.'s Resp. to EHT Defs.' SMF at ¶¶ 243–256.) The proper inquiry is not whether the incident could have been handled differently, but whether the Defendants' conduct violated the Fourth Amendment. *See Lane v. City of Camden*, No. 11-cv-5584, 2015 WL 5603039, at *7 (D.N.J. Sept. 23, 2015) (stating that "a plaintiff cannot defeat summary judgment 'by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless" and that "a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently" (citation omitted)); *McDougald v. Franklin Twp.*, No. 12-cv-3423, 2014 WL 1744772, at *5 (D.N.J. Apr. 30, 2014) (declining to "second-guess whether alternative actions by police officers 'might conceivably have been available'" to avoid a shooting (citation omitted)).

need only consider whether that force was objectively reasonable under the circumstances, regardless of the officers' underlying motive or intentions. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Although reasonableness is often a factual question, summary judgment is appropriate "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (citation omitted).

### i. Fact Issues Surround Whether Gardner Possessed A Pipe

"The primary step in assessing the constitutionality of the officers' alleged actions is to determine the relevant facts." *Giles*, 571 F.3d at 326. At this juncture, the Court must view the facts in the light most favorable to Gardner, *id.*, and in this qualified immunity case, "adopt[] the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Still, the EHT Defendants argue that they used objectively reasonable force—such that no Fourth Amendment violation occurred—because "the record is clear" that Gardner possessed a pipe that looked like a gun barrel, which came out of the water pointed directly at Swankoski. (EHT Defs.' Br. at 6.) The law, they argue, permits officers to use deadly force to stop deadly threats, or when officers make reasonable mistakes that such threats exist. (*Id.* at 6–7.) Gardner argues that a genuine dispute of material fact exists as to whether he possessed and pointed any object at Swankoski. (Pl.'s Opp. to State Defs.' Br. at 4–5.) The Court agrees with Gardner.

In addition to Gardner's own denial, which is evidence,[4] Gardner points to the testimony of Rios-Ortiz, who testified that he could see Gardner's hands, which "didn't have anything" in them. At another point, he said, "from what I saw, he didn't have a gun." The officers argue

---

[4] *See Waldron v. SL Indus., Inc.*, 56 F.3d 491, 501 (3d Cir. 1995) (explaining that "the Supreme Court has made it clear that self-serving testimony may be utilized by a party at summary judgment"). Indeed, it is "no more self-serving" than Defendants' own testimony used to support their motions. *Id.*

that this testimony cannot create a fact dispute on whether Gardner possessed the pipe because Rios-Ortiz is 66-years-old, wears glasses, has not seen an eye doctor in twenty-five years, saw the events from too far away, and testified inconsistently and contrary to various officers and Gardner. (EHT Defs.' Rep. Br. at 3–5; *see also* Nirenberg Rep. Br. at 6.)  But such credibility attacks are not appropriate at summary judgment.  *See Suarez v. City of Bayonne*, 566 F. App'x 181, 186 (3d Cir. 2014) ("The District Court's grant of summary judgment amounted to a determination that Suarez's deposition testimony was not credible and that the evidence in the Detectives' favor outweighed that in favor of Suarez, two determinations that it was not permitted to make at summary judgment.").

In addition to Rios-Ortiz's testimony, which defendant Nirenberg claims is too speculative,[5] a fact dispute exists as to whether Gardner pointed anything at Swankoski given Gardner's denial, as well as the testimony of Andrews.  True, Andrews stated that he could not tell if Gardner had anything in his hands.  But he also stated he observed Gardner "dragging" himself through the water by "grabbing" the marsh's pilings.  Drawing inferences in Gardner's favor, the Court finds that this testimony, if credited, could permit a reasonable jury to find that

---

[5] The Court gives the EHT Defendants the benefit of Nirenberg's argument, which contends that Rios-Ortiz's testimony is speculative because his "whole justification" for saying Gardner had no gun is because if he did, the metal would have reflected in the sun.  (Nirenberg Rep. Br. at 6.)  But in at least the two points noted above, Rios-Ortiz stated that he could see Gardner's hands and that he had no gun.  At another point, Rios-Ortiz is asked again if he could see Gardner's hands and he replies that if Gardner had a gun, he would have seen its reflection in the sun.  Whether this is Rios-Ortiz's "whole justification" for concluding that Gardner had no gun is unclear.  This answer may reflect an *additional reason* that Rios-Ortiz believes supports his other observations that Gardner had no gun.  Indeed, a few sentences later, Rios-Ortiz suggested that "if he had a gun, he should have throw[n] it."  Whatever the case, the Court must resolve doubts in Gardner's favor at this juncture.

Gardner's hands were free, i.e., that he did not possess an object during the encounter.[6]  These three threads of evidence—whatever their individual and cumulative strength—are enough to reach the fact finder.  The Court cannot conclude, as a matter of law, that the EHT Defendants acted objectively reasonable—or made an objectively reasonable mistake—in using deadly force when disputed facts surround whether Gardner possessed or pointed a gun-like object at Swankoski.

In response, Bordonaro and Swankoski argue that Gardner's version of events is "blatantly contradicted" by Highlands Forensics' objective report, which found bullet defects on the pipe recovered at the scene.  *See Scott*, 550 U.S. at 380–81 (holding that if "opposing parties tell two different stories, one of which is blatantly contradicted" or "so utterly discredited" by the record, a court should not adopt the fiction at summary judgment).  In their view, no reasonable jury could believe Gardner did not possess the pipe when he was shot because this objective evidence confirms what Bordonaro, Swankoski, Nirenberg, and another officer all said: that shots fired after a gun-like object emerged from the water pointed at Swankoski.  (EHT Defs.' Br. at 8–9.)  The Court disagrees.

The EHT Defendants cite no cases applying the *Scott* rule.  In *Scott*, video of a high-speed chase "blatantly contradicted" and "so utterly discredited" the respondent's version of his driving that no reasonable jury could believe it; thus the court should have viewed the evidence according to the tape, not the respondent's testimony.  *Id.*  But the *Scott* rule is "limited." *Patterson v. City of Wildwood*, 354 F. App'x 695, 698 (3d Cir. 2009).  In at least one case, the Third Circuit has applied it outside the context of video evidence.  In *Gunter v. Twp. of Lumberton*, 535 Fed. App'x 144 (3d Cir. 2013), the Third Circuit relied on dispatch and

---

[6] Defendants do not argue or direct the Court to evidence that Gardner concealed the pipe on his body or had stowed it elsewhere so that his hands would be free to grab and pull on the pilings.

defibrillator reports to reject the plaintiff's claim that officers delayed in responding to the medical needs of a man who died in their custody. *Id.* at 149. The plaintiff claimed that the officers waited ten to fifteen minutes to respond, but the Third Circuit found that the district court correctly declined to credit that account because it was blatantly contradicted by the objective reports, which identified exactly when the officers called for help. *Id.*

Here, Defendants offer forensic evidence that, unlike in *Scott* and *Gunter*, does not capture the when or how of the shooting: it merely states that the pipe recovered from the scene has bullet defects. That does not to prove that Gardner was holding the pipe when the officers shot. Concluding otherwise would require the Court to draw inferences *in favor of* the Defendants and *against* Gardner, the nonmovant. Accordingly, the forensic report does not "blatantly contradict" or "so utterly discredit" Gardner's claim that he did not possess the pipe. *See Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (declining to apply *Scott* in an excessive force case because the officer's forensic evidence, which was "silent" as to the "when and how" of disputed events did not blatantly contradict plaintiff's account of the events preceding police shooting). *Scott*'s "limited" rule does not apply here.

### ii. If Gardner Did Not Possess The Pipe, Fact Issues Still Surround Whether Shooting Was Objectively Reasonable

Even if Gardner did not possess or point the pipe at Swankoski, the EHT Defendants argue that they are entitled to summary judgment—and that no Fourth Amendment violation occurred—because their use of force was still objectively reasonable under the totality of the circumstances. (EHT Defs.' Br. at 9–11.) The Court disagrees.

Claims of excessive force—deadly or not—are analyzed under the Fourth Amendment's objective "reasonableness" standard. *Graham*, 490 U.S. at 395. Courts evaluate objective

reasonableness under a "totality of the circumstances" test,[7] judged from the perspective of the officer at the time of the incident and not with the benefit of hindsight. *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015); *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) ("Monday morning quarterbacking is not allowed"). The calculus must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are often tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Rivas*, 365 F.3d at 198.

The Third Circuit recently "clarif[ied]" its Fourth Amendment standard in deadly-force cases. *Johnson v. City of Philadelphia*, 837 F.3d 343, 349 (3d Cir. 2016). Previously, the Third Circuit articulated the inquiry in deadly force cases as: "Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others?" *Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999). It has since explained that although in many cases, these considerations will be "crucial," the "ultimate—and only—inquiry" is whether the officers' actions were objectively reasonable. *Johnson*, 837 F.3d at 349. In making that determination, "factors to consider include the 'severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Abraham*, 183 F.3d at 289 (quoting *Graham*, 490 U.S. at 396)). "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action,

---

[7] The Court may "consider[] all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force," not just the facts and circumstances at the "precise moment that excessive force is applied." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004).

whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

Adopting Gardner's version of events, a reasonable jury could find—under the totality of the circumstances—that it was not objectively reasonable for the EHT Defendants to use deadly force against Gardner. Gardner was shot in a desolate marsh with no homes, pedestrians, or vehicles nearby. He was unarmed, the lone suspect with which to contend, surrounded, and in near waist-deep, muddy water, which made it hard to move. A reasonable jury could find that it was not objectively reasonable for the EHT Defendants to believe that Gardner posed an immediate threat—including a significant risk of death or serious injury—to others. *Graham*, 490 U.S. at 396; *Abraham*, 183 F.3d at 289.

A reasonable jury could reach the same conclusion with respect to the threat Gardner posed to the officers. Significantly, Gardner claims that his hands were not submerged. Instead, he claims they could be seen. Of course, the EHT Defendants dispute this material fact. So does Nirenberg. They say his hands were submerged and out of view when they shot. The officers' accounts also suggest that Gardner may have been turning toward Swankoski when they shot, while Gardner testified that his back was to the officers when they shot. These disputes about what the officers could see and how Gardner was moving in the key moments before the shooting prevent summary judgment. And if Gardner's version is believed, a reasonable jury could find that it was not objectively reasonable for the officers to use deadly force because, as Gardner tells it, he "just turned" his back to the officers with his hands in view—though not up— to head in the opposite direction when the EHT Defendants fired.

Even if, as the officers' testimony may suggest, they shot as Gardner was turning towards Swankoski—as opposed to Gardner having already turned fully around—a "turn," in itself, does not suggests that Gardner made a sudden, furtive, or threatening movement with his in-sight hands to indicate he was reaching for a weapon when the officers shot.[8] *See Brittingham v. City of Camden*, No. 07-cv-190, 2009 WL 3151321, at *4 (D.N.J. Sept. 23, 2009) (denying motion to reconsider the denial of analogous state law immunity on summary judgment because "[w]hether or not Plaintiff made a threatening movement [with his hands] is highly material as well as highly disputed; the jury must resolve this factual dispute"). Nor does the record clearly establish the speed of Gardner's "turn," a fact that could bear on reasonableness. *See Remillard v. City of Egg Harbor City*, 424 F. Supp. 2d 766, 770 (D.N.J. 2006) (denying summary judgment because whether plaintiff "quickly turned towards" or turned "slowly towards" officer while raising his hands to his waist was "material" in assessing if officer had probable cause to believe plaintiff posed a threat of serious physical harm). That Andrews described Gardner as

---

[8] The cases cited by the officers are distinguishable on this basis. *See Lamont*, 637 F.3d at 184 ("But . . . the undisputed evidence shows that Quick pulled his hand out of his waistband, not as if he were surrendering, but abruptly and as though he were drawing a pistol."); *Ridgeway v. City of Woolwich Twp. Police Dep't*, 924 F. Supp. 653, 658 (D.N.J. 1996) ("Both Hurff and Ladd state that after Ridgeway was trapped in the parking lot, he leaned to the side in his car and reached down, in a manner consistent with picking up a weapon."); *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 403 (6th Cir. 2015) ("They shot after . . . Bynum . . . made gestures suggesting he had a weapon, gestures he continued to make even after officers told him to 'Drop it' and 'Don't do it.' It is these facts immediately preceding the shooting which weigh most heavily in assessing the officers' split-second decision to shoot."); *Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 856 (11th Cir. 2013) ("Montellis Clark refused the officers' commands and his family's requests to remove his hands from his pocket; and when he did take out his hands, he had a gun."). This case, by contrast, lacks undisputed evidence that Gardner made any such movement with his hands. *Compare Conde v. City of Atl. City*, 293 F. Supp. 3d 493, 505–06 (D.N.J. 2017) ("Of the witnesses who could see both of Mack's hands raise in the air and Mack's torso, the undisputed evidence shows that, at the very least, the possibility existed for Mack to reach into his waistband, where Smith and others state he holstered the weapon.").

"jumping" into the water before hearing shots a half second later is yet another reason for a fact finder here.

Other factors favor the officers. For example, Gardner refused commands, fled, and the EHT Defendants knew of Gardner's past violence, weapons possession, the BOLO, and could reasonably believe that he was armed and dangerous. But a reasonable jury could still find that even a man reasonably perceived as armed and dangerous need not be shot if it is objectively unreasonable for officers to believe he poses a significant threat to them or others, as in Gardner's telling here. *See Phong Duong v. Telford Borough*, 186 F. App'x 214, 217 (3d Cir. 2006) ("[w]ith his knife pointed away, a jury might believe Duong posed no imminent or actual threat" to justify being shot); *Curley v. Klem*, 298 F.3d 271, 280 (3d Cir. 2002) (reversing grant of summary judgment when facts suggested that plaintiff was shot "not because the totality of the circumstances indicated that Curley was the armed suspect sought and posed a dangerous threat" but "based on the single fact that Curley, like the suspect, was a black man with a gun"); *see also Connor v. Thompson*, 647 F. App'x 231, 237 (4th Cir. 2016) (stating that "mere possession of a [deadly weapon] by a suspect is not enough to permit the use of deadly force," which may be used only if "the officer or another person is threatened with the weapon.").

A reasonable jury could reach the same conclusion, even though Gardner was suspected of attempting to run over other law enforcement officers—a serious crime. Even if Gardner posed an immediate or significant risk of death or serious injury to the officers or others when he allegedly attempted to run over the State Defendants in his Jaguar, this threat may not extend indefinitely. A reasonable jury crediting Gardner's claim could find that he posed no such threat in the marsh. *See Lamont*, 637 F.3d at 184 ("Even where an officer is initially justified in using

force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."); *Abraham*, 183 F.3d at 294 (explaining that "a passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect").

Giving due regard to policing's split-second nature, a reasonable jury crediting Gardner's story could find, under the totality of the circumstances, that the EHT Defendants violated Gardner's Fourth Amendment rights when they fired. The Court does not suggest that the officers in fact acted unreasonably. Nor that the officers should not have fired their weapons. There are simply fact issues here that a jury must decide.

### iii. The EHT Defendants Violated Clearly Established Law

Next, the Court considers whether Gardner's constitutional right at issue was "clearly established" at the time of the incident. *See Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 n.4 (3d Cir. 2015) (stating that "the court may not deny a summary judgment motion premised on qualified immunity without deciding that the right in question was clearly established at the time of the alleged wrongdoing"). To be clearly established, a right must be sufficiently clear at the time of the challenged conduct that "every reasonable official would have understood that what he is doing violates that right." *Davenport v. Borough of Homestead*, 870 F.3d 273, 281 (3d Cir. 2017) (citation omitted). "That is, in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?" *Bennett v. Murphy*, 274 F.3d 133, 136–37 (3d Cir. 2002).

Here, in November 2013, the law clearly established that police officers may not use deadly force against a suspect who poses no threat of death or serious bodily injury to the officer or others. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (holding that a "police officer may not seize an unarmed, nondangerous suspect by shooting him dead"); *see also Lamont*, 637 F.3d at

185 ("It has long been the law that an officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others.").  To be sure, the "clearly established" prong of the immunity analysis requires the Court to define the right allegedly violated specifically, not generally, as does *Garner*.  But in an "obvious" case, *Garner*'s general standard can "clearly establish" the right at issue. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).  "Obvious" cases are those where, under Gardner's facts here, a suspect poses no threat of death or serious physical injury to others.  *See*, *e.g.*, *Davenport*, 870 F.3d at 281 (citing cases before the date of the incident here and explaining that "obvious" cases exist "in the absence of a serious threat of immediate harm to others"); *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 347 (6th Cir. 2007) ("When the suspect poses no immediate risk   of death or serious danger  .  .  .  *Tennessee  v.  Garner* provides   a 'clearly established' right that fulfills the second prong of the qualified immunity analysis."). Accordingly, every reasonable officer in November 2013 would know that it constitutes excessive force to shoot Gardner if his version of events is believed.

The Supreme Court's decision in *Kisela* is not to the contrary.  138 S. Ct. at 1152–53.  In *Kisela*, the Supreme Court held that an officer who shot a knife-wielding woman who moved "within a few feet" of another person and "failed to acknowledge at least two commands to drop the knife" did not violate clearly established law.  *Id.*  Although the suspect "appeared calm" when the officer shot, *id.* at 1151, she had been "hacking a tree" with the knife, and the officer "arrived on scene after hearing a radio report that a woman was engaging in erratic behavior." *Id.* at 1150–51.  The officer claimed he shot the woman because he "believed she was a threat to" the other person.  *Id.* at 1153.  Acknowledging that the *Garner* standard may apply to clearly establish rights in an "obvious" case, the Supreme Court held that *Kisela* was "far from" it.  *Id.*

Unlike *Kisela*, disputed facts surround whether Gardner held or pointed a weapon at anyone. If he did not, as the Court must accept, disputed facts also surround whether it was objectively reasonable for the officers to believe Gardner—unlike the suspect in *Kisela*—posed a safety risk to anyone. At this stage, the Court cannot grant the EHT Defendants qualified immunity.[9]

### 3. Section 1983—Excessive Force Against Nirenberg

Next, Gardner brings an excessive force claim under Section 1983 against Nirenberg, who discharged his weapon seven times in the marsh. In addition to the same or substantially similar arguments that the Court has rejected above, Nirenberg seeks summary judgment on this claim, arguing that his actions were objectively reasonable even under Gardner's version of events. Specifically, he argues that "[a]fter hearing a shot ring out, which [he] believed was [Gardner] firing at Swankoski," the use of deadly force was objectively reasonable under the totality of the circumstances. (Nirenberg Br. at 14, 16; *see also* Nirenberg Rep. Br. at 7.) The Court agrees. Even assuming that Gardner did not possess a pipe in his visible hands and that he had his back to the officers when they shot, qualified immunity shields Nirenberg here.

Nirenberg arrived on scene knowing that Gardner served 19 years for manslaughter and allegedly attempted to run over a state police officer while fleeing from the State Defendants. Although Gardner disputes that he attempted to run anyone over, Nirenberg is still entitled to rely on that information. Nirenberg was also present when a sawed-off shotgun and Tec-9 were recovered at Gardner's property. Nirenberg knew about the BOLO, which cautioned of

---

[9] "Because the question of qualified immunity is ultimately a question for the Court, this conclusion may change based on the facts found by the jury at trial." *Pratt v. City of Camden*, No. 13-cv-6830, 2018 WL 3201785, at *10 n.8 (D.N.J. June 29, 2018); *Curley*, 499 F.3d 199, 214 (3d Cir. 2007) ("The jury was not bound at trial, and the District Court was not bound post-trial, by our earlier statements involving a hypothetical set of facts favoring Curley, since the facts and inferences actually found by the jury were clearly different than those which we were required to posit in *Curley I* when considering the summary judgment order.").

Gardner's extreme violence and that he intended to shoot someone, including law enforcement, to avoid jail.  When Nirenberg got to the top of the hill, he observed Gardner's repeated refusal to comply with commands—including his own—and to put up his hands.  Gardner heard these commands.  Under the circumstances, Nirenberg had an objectively reasonable belief that Gardner was armed and dangerous.

From Nirenberg's perspective, he then heard a shot go off and fired in response to it.  Gardner does not dispute this sequence of events or present evidence to contradict it.  If Gardner's evidence is believed, his back was turned to the officers, and his non-reaching hands were visible—though not up—when the officers shot.  But in that tense and uncertain moment by the marsh, it was objectively reasonable for Nirenberg to believe that Gardner had fired at them—not the other way around—given: (1) Nirenberg's reasonable belief that Gardner was armed and dangerous; (2) Gardner's refusal to surrender, which Nirenberg could reasonably perceive as Gardner acting out his intentions as stated in the BOLO to avoid jail at all costs; (3) Gardner moving away from the officers in apparent flight in tandem with the sound of gun shots, which Nirenberg could reasonably believe was Gardner carrying out his intention to shoot police as stated in the BOLO; particularly where (4) Gardner repeatedly refused to show his hands, which, in a down position, could access a pocket or waistband in a split-second to grab and fire the kind of dangerous weapons Nirenberg knew (and reasonably believed) Gardner to possess and use against others.

Under these rapidly evolving circumstances, the Constitution does not require Nirenberg to wait to find out if he was the target of the gunfire before he may act on his reasonable belief that he and others are in danger.  Indeed, "[w]aiting in such circumstances could well prove fatal.  Police officers do not enter into a suicide pact when they take an oath to uphold the

Constitution." *Lamont*, 637 F.3d at 183. Giving due regard to policing's split-second nature, the Court finds that it was objectively reasonable for Nirenberg to believe that his use of force was necessary under these uncertain circumstances. *See Thompson v. Howard*, 679 F. App'x 177, 181 (3d Cir. 2017) (explaining that qualified immunity "gives ample room for mistaken judgments" and "protect[s] all but the plainly incompetent or those who knowingly violate the law"); *Curley*, 499 F.3d at 206 (explaining that "immunity is broad in scope" (citation omitted)).

Gardner's opposition is unavailing. He argues that Nirenberg is not entitled to qualified immunity because a genuine issue of fact exists as to whether Nirenberg acted intentionally, recklessly, or grossly negligent in firing seven shots. (Pl.'s Opp. to Nirenberg Br. at 8–10.) But the inquiry is not on the number of shots fired; it is on whether force continues after the threat ends. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014) (rejecting argument that "even if the use of deadly force was permissible, petitioners acted unreasonably in firing a total of 15 shots" because "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended"). Gardner makes only a passing reference to a fact that could bear on that inquiry when he says that he received one gunshot wound to his head while he was floating paralyzed in the water. But he does not link that argument to any record evidence tying that bullet to Nirenberg. Gardner is more mistaken in claiming that qualified immunity is unavailable when, as here, there is an "allegation" of intentional, reckless, or grossly negligent conduct. (Pl.'s Opp. to Nirenberg Br. at 9.) Clearly, that is not the law.

### 4. Section 1983—Unlawful Seizures Against The State Defendants

In his last Section 1983 claim, Gardner alleges that the State Defendants violated his Fourth Amendment rights by: (1) unlawfully seizing him in his Jaguar; and (2) failing to intervene to prevent the marsh shooting. (Pl.'s Opp. to State Defs.' Br. at 3–5.) The State Defendants argue that Gardner cannot maintain these claims because the State Defendants never seized Gardner, any seizure was reasonable, and because they were not present for—and their conduct did not cause—the shooting. (State Defs.' Rep. Br. at 1–6.) Because Gardner did not adduce evidence to show any Fourth Amendment violation, summary judgment is granted to the State Defendants.

### i. The State Defendants Did Not Seized Gardner

The State Defendants did not seize Gardner when they pursued his Jaguar. Both parties agree that *California v. Hodari D.* governs whether a "seizure" occurred. 499 U.S. 621, 626–28 (1991). Under *Hodari D.*, "[a] seizure occurs in one of two situations: (1) when officers apply physical force to the person being seized, or (2) when force is absent, where officers make a show of authority *and the person seized submits to the show of police authority*." *United States v. Samuels*, 131 F. App'x 859, 862 (3d Cir. 2005) (emphasis in original); *see also United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015).

Gardner argues that he was seized by "physical force" because "all four troopers had their guns trained on him after exiting the vehicle." (Pl.'s Opp. to State Defs.' Br. at 3.) But officers who draw their weapons have not used "physical force." Instead, they made a "show of authority." *See, e.g.*, *United States v. Waterman*, 569 F.3d 144, 146 (3d Cir. 2009) ("Here, there was no application of physical force. The police drew their guns in a 'show of authority.' While this act definitely constituted a display of force, we conclude that it fell short of the physical

force required under *Hodari D.*"); *United States v. Samuels*, 131 F. App'x 859, 862 (3d Cir. 2005) ("When the officers . . . took out their guns . . . at that point, a show of authority existed.").

Here, Gardner did not "submit" to this "show of authority." Quite the opposite, Gardner says that when he saw what turned out to be the State Defendants approaching with guns, he "took off." He points to no evidence of even a momentary pause before doing so, and Donegan testified that Gardner "immediately" sped off. *See*, *e.g.*, *United States v. Lowe*, 791 F.3d 424, 433 (3d Cir. 2015) (stating that the "most obvious example" of a suspect's failure to submit is where "a suspect runs from the police"); *United States v. Higdon*, 493 F. App'x 261, 265 (3d Cir. 2012) (finding that because suspect "did not actually stop in response to the officers' demand, he cannot be considered to have been seized under the Fourth Amendment"); *United States v. Johnson*, 432 F. App'x 118, 121 (3d Cir. 2011) (explaining that suspect did not "submit" to show of authority as required for a seizure because suspect never "manifest[ed] compliance with police orders" and instead, sped away "commencing a dangerous police chase"). As Gardner was not "seized," the Court need not assess whether any seizure was "reasonable."

### ii. The State Defendants Did Not Fail To Intervene

Gardner's second constitutional theory—which he calls "akin, if not a species of" a failure to intervene claim—fares no better. (Pl.'s Opp. to State Defs.' Br. at 4.) He argues that when defendant Huber called dispatch and set the chase in motion, he wrongly reported that Gardner had a gun. (*Id.*) Because no one called dispatch to correct this statement, Gardner claims the State Defendants violated his Fourth Amendment rights because they were "an important causal link" in the marsh shooting, a different seizure. (*Id.*)

Gardner's claim fails as a matter of law because he presents no evidence that the State Defendants were present for or had knowledge of the shooting yet failed to prevent it. *See Smith*

*v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) ("If a police officer . . . fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place *in his presence*, the officer is directly liable under Section 1983." (emphasis added)). Quite the opposite, Defendant Horsey testified that the State Defendants were "still on the Blackhorse Pike," a highway outside the marsh, when shots fired. (Horsey Dep. at 27:19–21.) Gardner cites no case to support a failure to intervene claim on these facts. Summary judgment is granted. *See Abrahante v. Johnson*, No. 07-cv-5701, 2009 WL 2152249, at *10 (D.N.J. July 14, 2009) (granting summary judgment on failure to intervene claim because "no reasonable jury could conclude that Ptlm. Pagnotto had a realistic and reasonable opportunity to intervene" when officer was not present at scene of arrest, where Plaintiff was punched); *accord Sloan v. Sobina*, No. 10-cv-221, 2012 WL 3648099, at *5 (W.D. Pa. July 31, 2012), *report and recommendation adopted*, No. 10-cv-221, 2012 WL 3648019 (W.D. Pa. Aug. 23, 2012) (granting summary judgment to defendants who were "not on the scene of the incident," "did not know about its occurrence until after the fact," and plaintiff provided no evidence placing them at the scene "as he must do in order to defeat a well-supported motion for summary judgment").[10]

### B. Excessive Force Against Nirenberg (Count I)

In Count I, Gardner brings an excessive force claim against Nirenberg. Nirenberg seeks summary judgment because Count I is duplicative of Gardner's other constitutional claims. (Nirenbrerg Br. at 11 n.2.) Gardner raises no opposition. As the Court has explained, "New Jersey courts analyze excessive force claims under the Fourth Amendment of the United States Constitution and Article 1, Paragraph 7 of the New Jersey Constitution." *See Gardner v. New Jersey State Police*, No. 15-cv-8982, 2016 WL 6138240, at *3 (D.N.J. Oct. 21, 2016). These are

---

[10] Thus, the Court need not address the arguments concerning causation as it relates to Huber's report of a gun and the claimed failure to clarify that statement.

the same provisions invoked in Gardner's NJCRA and Section 1983 excessive force claims (Counts V and VI). To the extent Gardner brings this claim against Nirenberg under federal law, summary judgment is granted because it is duplicative of Count VI. To the extent Gardner brings this claim under state law, the Court declines to exercise supplemental jurisdiction over it, as explained further below.

### C. Remaining Claims Against The State Defendants And Nirenberg

For various reasons, the State Defendants and Nirenberg seek summary judgment on Gardner's five remaining claims against them for: intentional infliction of emotional distress (Count II); Abuse of Process (Count III); Negligence (Count IV); violations of the NJCRA (Count V); and a claim for punitive damages (Count VII). "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995)). Having dismissed the Section 1983 claim, no federal law claims remain against the State Defendants or Nirenberg.[11] Nor is there an affirmative justification to retain supplemental jurisdiction over the remaining claims. They are dismissed.

---

[11] The Court notes ambiguity in Gardner's abuse of process claims against the State Defendants and Nirenberg. Nowhere does Gardner identify what process—state or federal—he believes was abused and why. To the extent Gardner brings this claim under federal law, the Court grants summary judgment to the State Defendants and Nirenberg because Gardner fails to properly support this claim. "It is not the Court's responsibility to comb the record on behalf of Plaintiff's counsel." *Baker v. The Hartford Life Ins. Co.*, No. 08-cv-6382, 2010 WL 2179150, at *2 n.1 (D.N.J. May 28, 2010), *aff'd Baker v. Hartford Life Ins. Co.*, 440 F. App'x 66 (3d Cir. 2011); *New Jersey Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388, 408 (D.N.J. 1998) (explaining that "it is the responsibility of each party to support its own contentions with a proper basis in the record of the case"). In fact, Gardner offers no argument opposing this claim's dismissal. To the

### D. NJCRA Claims Against The EHT Defendants (Count V)

In Count V, Gardner brings NJCRA claims against the EHT Defendants for excessive force. The NJCRA and Section 1983 are interpreted analogously. *See Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011) (interpreting the NJCRA analogously to § 1983); *Hedges*, 204 F.3d at 120 n.12 (concluding that New Jersey's constitutional provision concerning unreasonable searches and seizures is interpreted analogously to the Fourth Amendment). For the reasons above, the Court denies summary judgment to the EHT Defendants on this claim.

### E. IIED Against The EHT Defendants (Counts II)

In Count II, Gardner brings an IIED claim against the EHT Defendants. To recover, Gardner must establish "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988). The emotional distress suffered must be "so severe that no reasonable man could be expected to endure it." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. j (Am. Law Inst. 1965).) The severity of emotional distress is a question of law and fact, and the Court must initially determine whether, as a matter of law, such emotional distress can be found. *Buckley*, 544 A.2d at 864. As a "general rule," emotional distress is "severe" if it has a "dramatic impact on [a plaintiff's] every-day activities or on her ability to function daily." *Lascurain v. City of Newark*, 793 A.2d 731, 748 (N.J. Super. Ct. App. Div. 2002).

Here, Gardner suffered severe *physical* injury from the incident. But nowhere has he identified his severe *emotional* distress—not in his briefs, not in his statements of fact, and not

---

extent Gardner brings this claim under state law, the Court declines to exercise jurisdiction over it.

with an expert report or other medical evidence.[12]  The Court is not responsible for combing the record on Gardner's behalf to find sufficient evidence to withstand summary judgment.  *See supra* n.11.  Because Gardner has not met his burden to show that he has suffered severe emotional distress, summary judgment is granted on this claim.  *See Ribot v. Camacho*, No. 09-cv-5888, 2012 WL 2401983, at *6 (D.N.J. June 25, 2012) (granting summary judgment dismissing IIED claim because plaintiffs did "not identify what specific factual disputes preclude summary judgment or cite to any record evidence or case law in support of their claims.").

### F.  Negligence Against The EHT Defendants (Count IV)

Gardner's negligence claim, Count IV, seeks relief because "Defendants were negligent in their actions leading up to the shooting."  (Compl. at ¶ 47.)  Bordonaro and Swankoski argue that they are immune under N.J.S.A. § 59:3–3 and N.J.S.A. 59:5–2(b)(2).  N.J.S.A. 59:5–2(b)(2) states that public employees are not liable for an injury caused by "a person resisting arrest or evading arrest."[13]  This immunity, also known as "pursuit immunity," is absolute absent "willful misconduct."  *Alston v. City of Camden*, 773 A.2d 693, 697 (N.J. 2001).  Indeed, this section immunizes "*all* acts of negligence."  *Tice v. Cramer*, 627 A.2d 1090, 1100 (N.J. 1993) (emphasis in original); *Alston*, 773 A.2d at 701 (upholding jury instruction defining "willful misconduct" as more than gross negligence or recklessness).  The "clear" effect of N.J.S.A. 59:5–2(b)(2) is that it relieves officers "of whatever liability would otherwise attach for the officer's negligent conduct in connection with the pursuit," or else "there is no point whatsoever to the immunity." *Tice*, 627 A.2d at 1099.

---

[12] Nirenberg and the State Defendants challenged Gardner's claim on this basis (Nirenberg Br. at 26–27; State Defs.' Br. at 27–28).  Gardner failed to respond to this argument.

[13]  The parties do not dispute that Gardner resisted or evaded arrest.

N.J.S.A. 59:5–2(b)(2) immunizes Bordonaro and Swankoski from Gardner's negligence claim. If Gardner's "injuries were merely the product of [the defendants'] negligence in pursuing and arresting Plaintiff, then it cannot be said" that they exhibited willful misconduct. *Brittingham v. City of Camden*, No. 07-cv-190, 2009 WL 1410740, at *11 (D.N.J. May 18, 2009) (granting summary judgment dismissing negligence claim against investigator, who shot plaintiff, even though jury could find willful misconduct by investigator for purposes of plaintiff's assault and battery claims); *see also Mendelson v. Reyes*, No. 16-cv-04831, 2017 WL 773869, at *4 (D.N.J. Feb. 28, 2017) (barring negligence claim against officers under pursuit immunity on motion to dismiss). Moreover, Gardner does not establish that the EHT Defendants committed "a knowing violation of a specific command by a superior, or a standing order, that would subject [them] to discipline." *Fielder v. Stonack*, 661 A.2d 231, 243 (N.J. 1995) (holding that "in the context of a police officer's enforcement of the law, including the pursuit of a fleeing vehicle, willful misconduct is ordinarily limited to" such circumstances). The EHT Defendants' motion is granted.

### G. Punitive Damages Against The EHT Defendants (Count VII)

Finally, in Count VII, Gardner seeks punitive damages against the EHT Defendants. Although pled as its own Count, punitive damages are "not truly a separate cause of action but a prayer for relief, potentially applicable to any count on which the plaintiff ultimately prevails." *Bullock v. Borough of Roselle*, No. 17-cv-13208, 2018 WL 4179481, at *11 (D.N.J. Aug. 31, 2018). Only Gardner's Section 1983 and NJCRA excessive force claims remain against these defendants. In civil rights actions, punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

indifference to the federally protected rights of others." *Alexander v. Riga*, 208 F.3d 419, 431 (3d Cir. 2000) (citation omitted).

Here, the same factual disputes that preclude granting the EHT Defendants summary judgment on Gardner's constitutional claims also prevent summary judgment on his attempt to recover punitive damages. *See Pratt v. City of Camden*, No. 13-cv-6830, 2018 WL 3201785, at *15 (D.N.J. June 29, 2018) (denying officers' summary judgment motion because the "factual disputes that preclude granting [them] summary judgment" for excessive force and wrongful death claims arising from their use of deadly force "also require denial of their motion" regarding punitive damages); *Simmermon v. Gabbianelli*, 865 F. Supp. 2d 589, 605 (D.N.J. 2012) (combining qualified immunity and punitive damages inquiries because "a jury could find a lack of qualified immunity and impose punitive damages for essentially the same reasons").

## IV.     CONCLUSION

For the reasons above, the EHT Defendants' motion is **DENIED** as to Count V (NJCRA claim), Count VI (Section 1983 claim), and Count VII (Punitive damages claim).  The EHT Defendants' motion is **GRANTED**, however, on Count II (IIED) and Count IV (Negligence). The motions of Nirenberg and the State Defendants are **GRANTED**, and the state law claims against them are **DISMISSED** for lack of supplemental jurisdiction.


Dated:_____10/29/18_____                    /s/ Robert B. Kugler____
                                               ROBERT B. KUGLER
                                               United States District Judge